UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| FARAH NOERAND, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 20-11271-LTS |
| | ) | |
| ELISABETH P. DEVOS, in her official Capacity as Secretary of the United States Department of Education, and THE UNITED STATES DEPARTMENT OF EDUCATION | ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

ORDER ON MOTION FOR PRELIMINARY INJUNCTION (Doc. No. 2)

July 24, 2020

SOROKIN, J.,

For the reasons set forth below, the Motion filed by Plaintiff for Injunctive Relief (Doc. No. 2)[1] is ALLOWED IN PART.  The parties shall submit the further memoranda and status report as ordered below.

I.    DISCUSSION

A.   The Word "students" in the CARES Act Has A Clear, Unambiguous Meaning

In response to the coronavirus emergency, Congress passed the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act" or "Act"), Pub. L. No. 116-136, 134 Stat. 281 (2020), which, inter alia, appropriates billions of dollars to the Department of Education ("DOE" or "Department") for emergency relief to institutions of higher education ("IHEs").  CARES Act

---

[1] Citations to "Doc. No. __" reference documents appearing on the court's electronic docketing system; pincites are to the page numbers in the ECF header.

1

§ 18004(a). In creating the Higher Education Economic Relief Fund ("HEERF") Congress directed that schools may use half of the funding for the school's own needs, subject to various limitations not relevant here, and required IHEs to distribute the other half of the funding to the school's "students" for certain defined types of assistance. For purposes of the pending motion, the parties agree that the Plaintiff, Farah Noerand ("Plaintiff"), is a student at an IHE, Bunker Hill Community College ("BHCC"). The parties dispute whether Noerand is a "student" within the meaning of the CARES Act. This dispute turns not on a distinction between citizens and non-citizens, for the Department of Education approves the distribution of funds under the CARES Act to certain students who are not citizens. Rather, the dispute concerns the technical meaning of the word "students" and whether it encompasses, inter alia, non-citizens such as Noerand.

Noerand came to the United States at age fourteen in the aftermath of the devastating January 12, 2010 earthquake in Haiti for surgery to repairs burns she suffered in an electrical fire. She has remained in the United States since that time. Currently, she enjoys temporary protected status ("TPS"). Plaintiff entered the United States lawfully and her presence in the United States has always been and remains authorized by federal law.

The Department has applied the CARES Act to prohibit IHEs (i.e., colleges including BHCC) from distributing CARES Act funding to students such as Noerand enjoying TPS. The Department reaches this result by interpreting "students" in the CARES Act to mean only students eligible for funding under Title IV of the Higher Education Act of 1965, which awards funds to citizens as well as to some non-citizens such as green card holders. Doc. No. 10 at 2-3; 20 U.S.C. § 1091(a)(5). Persons with TPS or certain other immigration statuses are not eligible for Title IV funding or, under DOE's interpretation, CARES Act funding.

Because the parties dispute the meaning and clarity of the relevant provision of the CARES Act, the Court starts with the text of the statute.  Section 18004 of the Act, which establishes HEERF, provides, in relevant part:

> (a) IN GENERAL.— The Secretary shall allocate funding under this section as follows:
>
> > (1) 90 percent to each institution of higher education to prevent, prepare for, and respond to coronavirus, by apportioning it—
> >
> > > (A) 75 percent according to the relative share of full-time equivalent enrollment of Federal Pell Grant recipients who are not exclusively enrolled in distance education courses prior to the coronavirus emergency; and
> > >
> > > (B) 25 percent according to the relative share of full-time equivalent enrollment of students who were not Federal Pell Grant recipients who are not exclusively enrolled in distance education courses prior to the coronavirus emergency.
>
> . . . .
>
> (b) DISTRIBUTION.— The funds made available to each institution under subsection (a)(1) shall be distributed by the Secretary using the same systems as the Secretary otherwise distributes funding to each institution under title IV of the Higher Education Act of 1965 (20 U.S.C. 1001 et seq.).
>
> (c) USES OF FUNDS.— Except as otherwise specified in subsection (a), an institution of higher education receiving funds under this section may use the funds received to cover any costs associated with significant changes to the delivery of instruction due to the coronavirus, so long as such costs do not include payment to contractors for the provision of pre-enrollment recruitment activities; endowments; or capital outlays associated with facilities related to athletics, sectarian instruction, or religious worship. Institutions of higher education shall use no less than 50 percent of such funds to provide emergency financial aid grants to students for expenses related to the disruption of campus operations due to coronavirus (including eligible expenses under a student's cost of attendance, such as food, housing, course materials, technology, health care, and child care).

CARES Act § 18004.

In interpreting a statute, courts first look to "the ordinary public meaning of its terms at the time of its enactment.  After all, only the words on the page constitute the law adopted by Congress

3

and approved by the President." Bostock v. Clayton Cty., 140 S. Ct. 1731, 1738 (2020). If a statute's meaning is plain, the reviewing court "must give effect to the unambiguously expressed intent of Congress." Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843 (1984). When "the intent of Congress is clear, that is the end of the matter." Id. at 842.

The word "students" has a plain and ordinary meaning well understood in 2020 by the drafters of the CARES ACT, and the text of the statute demonstrates that the term "students" therein unambiguously carries its ordinary meaning. That meaning, "one who attends a school," encompasses persons enrolled in institutions of higher education without regard to their immigration or citizenship status. See "student," Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/student (last accessed July 23, 2020). Of course, Congress included no definition of "students" in the CARES Act, but no such definition was necessary for a commonly understood word used in its ordinary sense. Nor has the Department suggested that the word "students" is a term of art such that the Court should presume that Congress incorporated the term of art definition of the word by implication in the Act. See, e.g., In re Pharm. Indus. Average Wholesale Price Litig., 582 F.3d 156, 168 (1st Cir. 2009) ("'[W]here a statutory or regulatory term is a technical term of art, defined more appropriately by reference to a particular industry usage than by the usual tools of statutory construction,' we will employ that industry usage.") (quoting United States v. Lachman, 387 F.3d 42, 53 (1st Cir. 2004)). In addition, nowhere in the Act does Congress expressly limit the word "students" to students qualifying under the Higher Education Act (or any other statute).

Second, Congress's use of the word "students" in Section 18004 unambiguously evinces an intent to encompass all students without regard to their immigration status or eligibility for Title IV funding. In Section 18004(a)(1) of the Act, Congress mandated the formula the Secretary must

use in allocating the appropriated funds among the IHEs. This formula requires the Secretary to award "25 percent according to the relative share of full-time equivalent enrollment of students who were not Federal Pell Grant recipients," and "75 percent according to the relative share of full-time equivalent enrollment of Federal Pell Grant recipients." CARES Act §§ 18004(a)(1)(B), (A). Therefore, the formula requires the Secretary to allocate funds based, in part, on the number of TPS or other non-citizen students at an IHE. That Congress based its statutory allocation of funds—for both institutions and students—on a formula counting all students without regard to eligibility under Title IV (whether based on financial need or immigration status) demonstrates that Congress employed the word "students" in accordance with its ordinary meaning. The distinction it drew in the formula evinces Congress's understanding that it was using the word "students" in its ordinary sense thereby encompassing students ineligible for Title IV funding.

Third, when Congress restricted the reach of the word "students" elsewhere in the CARES Act, it did so expressly, not by changing the meaning of the word "students," but by attaching further express limitations. In calculating the allocation to each IHE, for example, the HEERF program expressly excluded students who were "exclusively enrolled in distance education courses prior to the coronavirus emergency." CARES Act §§ 18004(a)(1)(A), (B). The Act also limits certain payments to "students" to those students "eligible for work-study." See id. § 3505(a). An "affected work-study student" is defined as "a student enrolled at an eligible institution participating in the program under part C of title IV of the Higher Education Act of 1965." Id.

If, as the Department suggests, "students" within the CARES Act includes only persons otherwise eligible under Title IV of the Higher Education Act, then these textual restrictions

imposed by Congress are surplusage.[2]  Not only is this a disfavored result, see, e.g., United States v. Ven-Fuel, Inc., 758 F.2d 741, 751–52 (1st Cir. 1985) ("All words and provisions of statutes are intended to have meaning and are to be given effect, and no construction should be adopted which would render statutory words or phrases meaningless, redundant or superfluous."), but the Supreme Court has charged courts to "'give effect, if possible, to every clause and word of a statute.'"  Advocate Health Care Network v. Stapleton, 137 S. Ct. 1652, 1659 (2017) (quoting Williams v. Taylor, 529 U.S. 362, 404 (2000)).

Moreover, it is a general presumption that "[w]hen Congress includes particular language in one section of a statute but omits it in another, Congress intended a difference in meaning." Me. Cmty Health Options v. United States, 140 S. Ct. 1308, 1323 (2020) (internal quotation marks and citations omitted).  When Congress incorporated other terms from Title IV into the CARES Act, it did so expressly.  See, e.g., CARES Act § 18004(a)(2) (defining "cost of attendance" "as defined under section 472 of the Higher Education Act.").

Fourth, other provisions of the CARES Act use the term "students" in its plain and ordinary sense to encompass all students without regard to citizenship or type of immigration status.  For example, Section 753 of the Act establishes a "Geriatrics Workforce Enhancement Program" meant to support the training of health professionals working in geriatrics. Id. § 753(a)(2)(A).  Section 753 provides in relevant part that "[a]ctivities conducted by a program under this section may include . . . [p]roviding education on Alzheimer's disease and related dementias to . . . health professions students, faculty, and providers." Id. § 753(a)(2)(B)(iv).  This provision is not sensibly read to exclude students ineligible for Title IV funding.  Likewise, the

---

[2] This is so whether the statute unambiguously excludes persons not eligible under Title IV, a position the government has not advanced, or is ambiguous and thus subject to construction by DOE.

Secretary of Health is permitted to "give priority to any program that . . . provides training to integrate geriatric care into other specialties across care settings, including . . . students from all health professions." Id. § 753(a)(5)(A)(iii)(II).

The same problem arises when other Sections of the Act pertaining to education are read in the more restrictive manner advanced by the Department. Nowhere is this clearer than in Section 18002, which establishes the Governor's Emergency Education Relief Fund ("GEERF"). The GEERF provides Emergency Education Relief grants "to the Governor of each State with an approved application," to be used, inter alia, to "provide emergency support through grants to institutions of higher education serving students within the State that the Governor determines have been most significantly impacted by coronavirus. . ." Id. §§ 18002(a), (c)(2) (emphasis added). If "students" meant only "Title IV eligible" students each time it is used throughout the Act, then an IHE "serving" either noncitizen students, even those lawfully present in the United States, or students not receiving Title IV aid, are perforce excluded from receipt of these grants. As the GEERF is also available to elementary and secondary education institutions—institutions which by definition are not included in Title IV's eligibility standards—as well as other "education related entit[ies,]" such a reading of the statute would render these provisions non-sensical. Id. §§ 18002(b), (c).

In short, to read these provisions as limited to students eligible under Title IV would lead to absurd results. See United States v. Turkette, 452 U.S. 576, 580 (1981) ("absurd results are to be avoided"); see also Dep't of Revenue of Or. v. ACF Indus., 510 U.S. 332, 342 (1994) (The "normal rule of statutory construction [is] that identical words used in different parts of the same act are intended to have the same meaning.") (internal quotation marks and citations omitted).

Fifth, when Congress excluded certain categories of non-citizens in the CARES Act, it did so expressly. Section 2201 provides for a one-time "Recovery Rebate" of $1,200 for "eligible individuals" earning less than $75,000 per year. CARES Act § 2201. Nonresident aliens are specifically excluded from this benefit, while qualifying resident aliens must meet one of two narrow exceptions to be eligible.[3] Id. Plainly, Congress understood how to exclude non-citizens and establish specific eligibility criteria for funding made available in the CARES Act. Similarly, Section 1102 of the Act, which established the Paycheck Protection Program ("PPP"), provides loans for small businesses to cover payroll costs and other enumerated operating expenses such as rent and utilities. Id. § 1102(a)(2)(36)(F)(i). However, the Act makes clear that that PPP loans may not be used to remunerate "an employee whose principal place of residence is outside of the United States." Id. § 1102(a)(2)(36)(II)(cc). That Congress spoke with clarity elsewhere in the Act in limiting eligibility for certain programs and benefits and yet did not qualify the word "students" in Section 18004 is strong evidence that it meant not to do so.

Finally, both of the courts that have to date interpreted Section 18004 of the CARES Act have also concluded that the meaning of the word "students" is unambiguous. See Washington v. Devos, No. 20-cv-0182-TOR, 2020 U.S. Dist. LEXIS 103388, at *33-34 (E.D. Wash. June 12,

---

[3] The two tests used to determine eligibility— the "green card test" and the "substantial presence test"—are found in the Internal Revenue Code. See 26 U.S.C. The green card test is met by being issued an alien registration card, Form I-551 by U.S. Citizenship and Immigration Services ("USCIS"). See 26 C.F.R. § 301.7701(b)-1; see also Alien Residency–Green Card Test, IRS.GOV, https://www.irs.gov/individuals/international-taxpayers/alien-residency-green-card-test (last updated Feb. 20, 2020). The substantial presence test requires an individual to be physically present in the United States on at least 31 days in the current year, and 183 days during the 3-year period that includes the current year and the 2 years immediately preceding it, counting all the days in the current year, one-third of the days in the previous year, and one sixth of the days in the year before that. See 26 U.S.C. § 7701(b)(3); see also Substantial Presence Test, IRS.GOV, https://www.irs.gov/individuals/international-taxpayers/substantial-presence-test (last updated Jan. 15, 2020).

2020) ("[T]here is no ambiguity for which the Defendants can interpret the CARES Act to be limited only to those individuals eligible for Title IV assistance under the HEA."); Oakley v. Devos, No. 20-cv-03215-YGR, 2020 U.S. Dist. LEXIS 106092, at *26 (N.D. Cal. June 17, 2020) ("The Court interprets the absence of any explicit reference to title IV eligibility requirements or related grant of authority to the Secretary in Section 18004 as intentional.").

One more point bears mention. The Department points to another portion of the text of the CARES Act that it contends supports its assertion that the statute is ambiguous and that its reading of the statute is a reasonable one, entitled to deference. Doc. No. 10 at 2. The Act directs the Secretary to use the "same systems" for distribution of HEERF funding that she uses for the distribution of funding under Title IV. CARES Act § 18004(b). But that is of no moment. Congress merely required the Secretary to use her existing administrative and electronic apparatus, thereby (presumably) simplifying and accelerating the distribution of aid. Nothing in this "same systems" provision implies the imposition of an eligibility requirement on the funding so distributed, or implicitly incorporates Title IV's eligibility requirements, or renders an otherwise plain and clear statute ambiguous. Accord Oakley, 2020 U.S. Dist. LEXIS 106092, at *24 ("The statutory provision cited in the CARES Act which describes those 'systems' only refers to operational systems used for administration of funds, not eligibility requirements."); Washington v. Devos, 2020 U.S. Dist. LEXIS 103388, at *27.

Moreover, when Congress has used the term "systems" in the past with reference to Title IV, it has done so in a way that refers to administrative systems with no mention of eligibility requirements. For example, 20 U.S.C. § 1018, which establishes a Performance-Based Organization "responsible for managing the administrative and oversight functions supporting the programs authorized under [Title IV,]" makes reference to "the delivery system of student aid

under [Title IV].  Id. §§ 1018(a), (c)(3).  Likewise 34 C.F.R. § 668.16, which governs standards of administrative capability for IHEs participating in Title IV programs, enumerates a list of factors by which the Secretary determines an IHE's capability of delivering Title IV aid, one of which is "[t]he financial aid delivery system used by the institution."  34 C.F.R. § 668.16(b)(2)(iv).  Absent clear guidance from Congress to the contrary, such repeated references to "aid delivery systems" suggest only that the term "systems," as used throughout the relevant statutes and regulations, as well as within the CARES Act itself, is meant to refer to operational systems used for administering and delivering aid from the Department to participating IHEs.

The Department counters that "the use of the words 'financial aid' to qualify the word 'grants'" in the CARES Act suggests that Congress intended to attach Title IV eligibility to HEERF funds.  Doc. No. 10 at 12.  In support of this, the Department argues that because Congress in Section 18004 defined "cost of attendance" as having the same meaning given the term "in section 472 of the Higher Education Act," Congress must have meant to import Title IV's eligibility standards into the CARES Act or at least that the language renders the statute ambiguous on this point.  Id. (citing CARES Act § 18004(a)(2)).

This argument quickly falters.  Title IV's definition of "cost of attendance" refers simply to the tuition and fees accrued by a student attending an educational institution and makes no mention of a students' immigration status or Title IV eligibility.  See 20 U.S.C. § 1087ll.  In short, there is nothing to suggest that Congress meant for this reference to incorporate eligibility requirements found elsewhere in the code and wholly unrelated to the cost of attendance.  That the Department would prefer to limit CARES Act funds to students eligible under Title IV whether for administrative convenience, policy reasons, or otherwise must yield to the unambiguous statute enacted by Congress.

For the foregoing reasons, the Court determines that the CARES Act unambiguously authorized the provision of funds under Section 18004 to students without regard to their immigration status, i.e., without regard to whether the student is eligible for Title IV financial aid, and rejects the Department's contention that the statute is ambiguous on this point. In so construing the CARES Act, the Court has considered the provisions of 8 U.S.C. § 1611 (described below), but concludes that the terms of that statute, even combined with the Department's other arguments, are insufficient to render ambiguous the clear commands set forth in the CARES Act.

B. <u>Section 1611 Does Not Bar Relief to the Plaintiff</u>

Alternatively, the Department contends that Plaintiff's claim fails under another federal statute. Section 1611 of Title 8 provides:

(a) In general

Notwithstanding any other provision of law and except as provided in subsection (b), an alien who is not a qualified alien (as defined in section 1641 of this title) is not eligible for any Federal public benefit (as defined in subsection (c)).

. . . .

(c) "Federal public benefit" defined

(1) Except as provided in paragraph (2), for purposes of this chapter the term "Federal public benefit" means—

(A) any grant, contract, loan, professional license, or commercial license provided by an agency of the United States or by appropriated funds of the United States; and

(B) any retirement, welfare, health, disability, public or assisted housing, postsecondary education, food assistance, unemployment benefit, or any other similar benefit for which payments or assistance are provided to an individual, household, or family eligibility unit by an agency of the United States or by appropriated funds of the United States.

> (2) Such term shall not apply—
>
>> (A) to any contract, professional license, or commercial license for a nonimmigrant whose visa for entry is related to such employment in the United States, or to a citizen of a freely associated state, if section 141 of the applicable compact of free association approved in Public Law 99-239 or 99-658 (or a successor provision) is in effect;
>>
>> (B) with respect to benefits for an alien who as a work authorized nonimmigrant or as an alien lawfully admitted for permanent residence under the Immigration and Nationality Act [8 U.S.C. 1101 et seq.] qualified for such benefits and for whom the United States under reciprocal treaty agreements is required to pay benefits, as determined by the Attorney General, after consultation with the Secretary of State; or
>>
>> (C) to the issuance of a professional license to, or the renewal of a professional license by, a foreign national not physically present in the United States.

8 U.S.C. § 1611(a), (c).

The funds distributed to students under HEERF of the CARES Act appear to fit comfortably within the definition of "federal public benefit." They are "grants" or "postsecondary education" benefits paid for "by appropriated funds." Although Section 1611 does not limit federal benefits to citizens, Noerand does not allege that she is a "qualified alien" within the meaning of Section 1611. Despite the Department's contention that this ends the matter, Doc. No. 10 at 6-10, it does not.

Plaintiff argues that the exception to Section 1611 provided in 8 U.S.C. § 1611(b)(1)(B), which reaches "short-term, non-cash, in-kind emergency disaster relief," encompass the CARES Act relief at issue in this case. Id. at 10. Plaintiff makes a strong argument that the relief provided pursuant to HEERF is "short-term emergency disaster relief." See generally Doc. No. 12. Therefore, the parties' dispute, at least for now, centers on whether the relief qualifies as "in-kind, non-cash" relief. The present briefing touches, at best, only minimally on the meaning of this exception. Thus, at this preliminary stage, the Court declines to construe the exception and instead

assumes, without deciding, that the exception does not reach the relief at issue in this case. Thus, standing alone, Section 1611 would prohibit Plaintiff from receiving the relief requested.

However, Section 1611 does not stand alone; rather the Court must reconcile it with the CARES Act. The canons of statutory construction readily explain how to reconcile two seemingly conflicting statutes. As the Supreme Court has explained, "it is a commonplace of statutory construction that the specific governs the general." Morales v. TWA, 504 U.S. 374, 384 (1992). Section 18004 of the CARES Act is a specific statutory enactment in which Congress unambiguously directed certain aid to a plainly defined group of people. In these circumstances, to the extent that the CARES Act directs a federal public benefit, it constitutes a statutory exception to Section 1611's general denial of federal public benefits. In light of this conclusion, the Court rejects the Department's twin arguments that Section 1611 bars relief and that Noerand lacks standing, see Doc. No. 10 at 6, for the standing contention relies entirely on the application of Section 1611.

The Department argues that making HEERF benefits available to Plaintiff would constitute an implied repeal of Section 1611, which is a disfavored approach. See, e.g., Morton v. Mancari, 417 U.S. 535, 549 (1974) ("[R]epeals by implication are not favored.") (internal quotation marks and citations omitted). Not so. During the hearing on this motion, the Department invoked United States v. Arif, 897 F.3d 1 (1st Cir. 2018) in support of its position. That case is inapposite for it addressed an implied repeal argument, not a conflict between statutes. There, a criminal defendant contended that an (arguably) later statute enacting criminal penalties impliedly repealed the earlier wire fraud statute insofar as the wire fraud statute also criminalized defendant's actions. See Arif, 897 F.3d at 6-8. Just as Justice Scalia's analysis cited by the Circuit explains its resolution of that matter, id. at 5 ("A steady adherence to [the implied repeal doctrine] is important, primarily to

facilitate not the task of judging but the task of legislating.") (internal quotation marks and citation omitted), so too does Justice Scalia's analysis explain that when, as here, Congress enacts an unambiguous statute granting relief to a group of persons, the Members of Congress should not be understood to have voted on the legislation in question by engaging in a "blind gamesmanship" to estimate the likelihood a court will later hold the legislation to have effected a partial repeal of some prior general law, or instead decline to enforce fully a statute as enacted, United States v. Hansen, 772 F.2d 940, 944 (D.C. Cir. 1985) (Scalia, J.). Rather, Congress can safely rely on the canons applied above to privilege the later specific statute, within its terms, over the older, more general, statute.

### C.  Plaintiff Has Met Her Burden to Obtain an Injunction

In light of the foregoing interpretations of the relevant statutes, the Court turns to Noerand's pending motion for a preliminary injunction. Doc. No. 2. Plaintiff bears the burden of establishing each of the four elements of the familiar test for such relief. See Esso Std. Oil Co. v. Monroig-Zayas, 445 F.3d 13, 18 (1st Cir. 2006) ("The party seeking the preliminary injunction bears the burden of establishing" entitlement to the injunction). In adjudicating a motion for a preliminary injunction, the Court must weigh four factors: "(1) the plaintiff's likelihood of success on the merits; (2) the potential for irreparable harm in the absence of an injunction; (3) whether issuing an injunction will burden the defendants less than denying an injunction would burden the plaintiffs; and (4) the effect, if any, on the public interest." United States v. Weikert, 504 F.3d 1, 5 (1st Cir. 2007). Though the Court must consider each of these factors, the most important is "the movant's likelihood of success on the merits." Borinquen Biscuit Corp. v. M.V. Trading Corp., 443 F.3d 112, 115 (1st Cir. 2006).

Here, Plaintiff Noerand has demonstrated a likelihood of success on the merits. In these circumstances, the public interest and balance of the equities favors granting relief as does the obvious risk of irreparable harm to Noerand in the absence of relief.[4]

II. CONCLUSION

For the foregoing reasons, the Court, preliminarily, rejects the Secretary's interpretation of the CARES Act, determines that the CARES Act directs the distribution of funds to students of any immigration status (e.g., green card holders, TPS recipients, etc.) and ALLOWS IN PART the Motion for a Preliminary Injunction (Doc. No. 2) to the extent that the Secretary of Education and the Department of Education, including their agents and employees (which includes Bunker Hill Community College as well as BHCC's employees and agents), may not deny Noerand CARES Act funding on the grounds that her TPS status renders her ineligible for Title IV aid.

Plaintiff requests that the Court's injunction should go further. She argues that at issue in this case is the Department's Interim Rule embodying the Department's interpretation of the CARES Act and that, if she prevails in this case, the final judgment under the APA will set aside the application of this Interim Rule in Massachusetts. Because this issue was not fully developed in the papers, the Court believes further briefing would be of assistance and fair also to the parties.

Thus, by Friday July 31, 2020, Defendant may file a supplemental memo not to exceed ten pages explaining why the Court's Order should reach no further than its present scope and addressing in particular the Plaintiff's contention noted above. Plaintiff may file a reply, not to exceed seven pages, by Wednesday August 5, 2020. No later than Friday August 7, 2020, the

---

[4] Notably, the entire point of the CARES Act was to grant emergency relief to a range of different persons to avoid the irreparable harm otherwise occasioned by the coronavirus.

parties shall submit a joint status report setting forth their joint or separate positions for a schedule to govern the remainder of this case.

                                        SO ORDERED.

                                         /s/ Leo T. Sorokin
                                        Leo T. Sorokin
                                        United States District Judge